# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**LEXINGTON INSURANCE COMPANY,**

                Plaintiff,

      -vs-                                          Case No. 11-C-809

**TUDOR INSURANCE COMPANY,**

                Defendant.

## DECISION AND ORDER

In the 1990's, Trek Bicycle Corporation developed contractual relationships with cyclists Greg LeMond and Lance Armstrong. Eventually, Trek found itself in the middle of the well-known dispute between the two cyclists regarding Armstrong's use of performance enhancing drugs. *See* Reed Albergotti, *Feud Sends Cycling World Spinning*, The Wall Street Journal, June 10, 2009.[1] In 2008, LeMond's company, LeMond Cycling, Inc., sued Trek in Minnesota, alleging that Trek failed to protect the LeMond brand from disparaging comments made by Armstrong and his representatives. The parties settled before trial.

This lawsuit is a spin-off of the LeMond Cycling lawsuit. Trek tendered defense of the LeMond lawsuit to Lexington Insurance Company and Tudor Insurance Company. Lexington spent over $1 million in defense and settlement of the claims. Tudor disclaimed coverage and refused to provide any defense. Lexington alleges that as a "direct result of

---

[1] http://online.wsj.com/article/SB124459634335000647.html.

Tudor's breach of its duty to defend Trek in the LeMond Cycling Lawsuit, Lexington has incurred costs in the defense and settlement of the LeMond Cycling Lawsuit beyond what it was obligated to pay." Complaint, ¶ 29.

The Court bifurcated this litigation into two phases. First, and in the context of the now-pending cross-motions for summary judgment, the Court must determine whether Tudor had a duty to defend Trek in the LeMond Cycling Lawsuit. Second, if this case survives summary judgment (i.e., if Lexington's motion is granted and Tudor's motion is denied), the Court will proceed to determine the extent of Lexington's recoverable damages and the merits of Lexington's bad faith claim. This case will proceed to phase two.

***

Summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The plain language of the rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The Court must accept as true the evidence of the nonmovant and draw all justifiable inferences in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment is appropriate only if, on the record as a whole, a rational trier of fact could not find for the non-moving party. *Rogers v. City of Chi.*, 320 F.3d 748, 752 (7th Cir. 2003). When confronted by cross-motions for summary judgment, "inferences

are drawn in favor of the party against whom the motion under consideration was made." *McKinney v. Cadleway Prop., Inc.*, 548 F.3d 496, 500 (7th Cir. 2008). The Court considers each party's motion individually to determine if that party has satisfied the summary judgment standard. *In re FedEx Ground Package Sys., Inc.*, 734 F. Supp. 2d 557, 583-84 (N.D. Ind. 2010).

**I.    Duty to Defend**

An insurer has a duty to defend if coverage is arguable or fairly debatable, and any doubts are resolved in favor of the insured. *Sawyer v. West Bend Mut. Ins. Co.*, 821 N.W. 2d 250, 255 (Wis. Ct. App. 2012). Insurers must defend when the facts alleged in the four corners of the complaint, if proven, would constitute a covered claim. *Id.* In other words, the duty to defend hinges on the nature, not the merits, of the claims. *Sch. Dist. of Shorewood v. Wausau Ins. Co.*, 488 N.W. 2d 82, 87 (Wis. 1992). The duty to defend is necessarily broader than the duty to indemnify because the duty to defend is triggered by "arguable, as opposed to actual, coverage." *Fireman's Fund Ins. Co. of Wis. v. Bradley Corp.*, 660 N.W. 2d 666, 674 (Wis. 2003).

What follows is a summary of the relevant allegations in LeMond Cycling's complaint against Trek:

- Since at least 1998, Lance Armstrong had a contractual relationship with Trek, pursuant to which he acted as an endorser and spokesperson for Trek-branded bicycles, and Trek sponsored the professional cycling team for which Mr. Armstrong once raced. Since the inception of the relationship, Trek used Armstrong's name and image extensively in its marketing, including on its website. (This relationship recently ended, although Armstrong retains a small share in the company. Ben

-3-

> Delaney, *Trek breaks ties with Lance Armstrong*, Cycling News, Oct. 18, 2012).[2]

- In 2004, when making the claim that LeMond Cycling was in breach of its licensing agreement with Trek, Trek claimed that Armstrong was an asset of Trek and that because LeMond was causing harm to one of Trek's assets, Trek could end the relationship with LeMond Cycling and possibly seek damages.

- On numerous occasions, Armstrong and/or his representatives have taken actions or made remarks that are disparaging of Greg LeMond and therefore harmful to the LeMond brand. Trek did nothing to protect the LeMond brand from such actions and remarks even when faced with explicit requests from Mr. LeMond that Trek intervene for the protection of the LeMond brand.

- In 2005, pursuant to a subpoena, LeMond gave confidential testimony in a private arbitration between Mr. Armstrong and a company that he sued. This testimony was leaked to the media by a third party not known by or associated with Mr. LeMond or LeMond Cycling. Upon information and belief, the third party who leaked the testimony was an Armstrong representative.

- Out of fear for his business and to gratify Trek's repeated requests, LeMond eventually acquiesced to allow the release of a public statement that restated his views regarding Armstrong's acquaintance Dr. Michele Ferrari. Instead of a press release, however, a purported interview was published in *USA Today*. Mr. LeMond never conducted an interview with any individual from *USA Today* during 2001, nor did he authorize or approve the release of any story creating the impression that an interview had taken place. Upon information and belief, the purported interview published in *USA Today* was orchestrated by a representative for Mr. Armstrong.

- Within days of the publication of an interview with LeMond in the French newspaper *Le Monde* in 2004, Trek contacted LeMond's attorney to complain about the interview. Trek claimed that it had received a large volume of emails expressing a negative reaction to the article. Upon information and belief, the actual volume of emails was significantly smaller than what was claimed. Also upon information

---

[2] http://www.cyclingnews.com/news/trek-breaks-ties-with-lance-armstrong.

-4-

and belief, a large percentage of these emails were drafted either by
Trek or with Trek's involvement.

- In a letter dated August 10, 2004, Trek, through its attorney, wrote to
LeMond Cycling and provided notice that Mr. LeMond's actions put
LeMond Cycling in breach of the "moral turpitude" section of the
licensing agreement between Trek and LeMond Cycling.

- In late 2004 and/or early 2005, without any valid justification and
without any prior justification with Mr. LeMond, Trek's sales
representatives in numerous states were notified that Trek was giving
up the LeMond brand. As early as 2004, those sales representatives
notified dealers who carried the LeMond brand that Trek was giving up
the brand.

- During late 2004 and early 2005, several dealers expressed to Mr.
LeMond that they wanted to continue selling LeMond-branded bikes,
but could not get LeMond-branded bikes and had been told that the
LeMond brand was being discontinued.

- As early as November 2004, international distributors were being
informed that Trek's distribution of the LeMond brand was ending.

- In August of 2006, Trek made a request that Mr. LeMond not attend
Trek's annual dealer show in Madison, Wisconsin. LeMond protested
that this decision was detrimental to the LeMond brand, but Trek
insisted that LeMond not attend.

- In early 2005, Mr. Armstrong and/or someone working on his behalf
disparaged a LeMond-branded product to a potential customer. Trek
was informed of the alleged incident, but did nothing to intervene for
the protection of the LeMond brand.

- Trek's failure to exert best efforts and satisfy its covenant of good faith
and fair dealing pursuant to its licensing agreement with LeMond
Cycling caused LeMond Cycling to lose revenue and caused damage
to the LeMond brand.

Under the Commercial General Liability ("CGL") policies issued to Trek, Tudor was

obligated to pay "those sums that the insured becomes legally obligated to pay as damages

-5-

because of 'personal and advertising injury' to which this insurance applies." ECF No. 24-1, at 7, 57, 117, 178, 229 (Coverage B Personal and Advertising Injury Liability, Section 1(a)). "Personal and advertising injury" means injury arising out of a variety of offenses, including, as relevant here, "Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services," in addition to "Oral or written publication of material that violates a person's right of privacy." *Id.* at 15, 65, 124, 185, 236 (Section V, Definitions, Sections 14(d), 14(e)). The alleged "personal and advertising injury" must be "caused by an offense arising out of [the insured's] business." *Id.* at 8, 58,117, 178, 229 (Coverage B Personal and Advertising Injury Liability, Section 1(b)).

Tudor argues that the "personal and advertising injury" clause does not apply because the claims brought by LeMond Cycling were for breach of contract, not for slander or libel (i.e., defamation), and also not for disparagement of goods, products or services. But what matters is "not the legal label that the plaintiff attaches to the defendant's (that is, the insured's) conduct, but whether that conduct as alleged in the complaint is at least arguably within one or more of the categories of wrongdoing that the policy covers." *Curtis-Universal, Inc. v. Sheboygan Emergency Med. Srvs., Inc.*, 43 F.3d 1119, 1122 (7th Cir. 1994) (applying Wisconsin law). Here, as in *Curtis-Universal*, the complaint alleges that false information was disseminated about Greg LeMond and LeMond Cycling, which qualifies as a charge of defamation. *Id.* at 1124; *see also Towne Realty, Inc. v. Zurich Ins. Co.*, 534 N.W. 2d 886, 891 (Wis. Ct. App. 1995) ("while the . . . complaint did not expressly state a claim

-6-

for libel or slander, the implication of this allegation is that Towne published false or misleading statements about them that caused damage to their reputation"). According to the allegations of the complaint, Trek did not publish defamatory material – Lance Armstrong did – but this distinction is irrelevant because coverage applies when the injury "arises out of the insured's business," and Trek was undoubtedly in the Lance Armstrong (and Greg LeMond) business.

The policies also provide coverage for product or service disparagement. Here, the complaint alleges that Trek and its agents disparaged the LeMond brand in numerous ways – to wit, by telling distributors that the line was being discontinued, by asking LeMond not to attend a yearly dealer show, and by drafting fake consumer emails expressing a negative reaction to LeMond's remarks in a newspaper interview. *Towne Realty*, 534 N.W. 2d at 891 ("The Balestrieris' allegation that they could no longer engage in their chosen profession, taken in conjunction with their allegation that they were maligned by Towne, suggests that Towne disparaged the Balestrieris' services"); *Stanislawski v. Jordan*, No. 03-C-1022, 04-C-516, 2006 WL 482397, at *4 (E.D. Wis. Feb. 28, 2006) ("Although the complaint does not use the legal labels of slander, libel or disparagement, it plainly alleges that the Stanisawskis published material that, at least from Studio Designs' perspective, was disparaging. Accordingly, the complaint alleges a 'personal and advertising' injury contemplated by the policy"). Finally, the complaint states a claim for violation of LeMond's right to privacy, another category of "personal and advertising" injury based upon Armstrong's leak of LeMond's confidential testimony and Armstrong's orchestration of a fake LeMond interview

-7-

in *USA Today*. For all of the foregoing reasons, the LeMond Cycling complaint states numerous arguable claims for personal and advertising injuries which triggered Tudor's duty to defend.

**II.     Exclusions**

Exclusionary clauses are narrowly construed against the insurer, and if the effect of an exclusion is ambiguous or uncertain, it will be construed in favor of coverage. *Day v. Allstate Indem. Co.*, 798 N.W. 2d 199, 206 (Wis. 2011). It is the insurer's burden to prove that any policy exclusions apply. *U.S. Fire Ins. Co. v. Green Bay Packaging, Inc.*, 66 F. Supp. 2d 987, 995 (E.D. Wis. 1999). "If there is any doubt about the duty to defend, it must be resolved in favor of the insured." *Elliot v. Donahue*, 485 N.W. 2d 403, 407 (Wis. 1992).

None of the exclusions raised by Tudor can excuse its duty to defend:

**2.     Exclusions**

*This insurance does not apply to:*

a.     *"Personal and Advertising injury":*

   (1)     *Caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury";*

   ...

Under Wisconsin law, this exclusion is construed narrowly against the drafter, such that unless the insured acts intentionally *and* intends some specific harm or injury to result, the exclusion does not apply. *Liebovich v. Minn. Ins. Co.*, 751 N.W. 2d 764, 783 (Wis. 2008). The LeMond Cycling complaint does not allege that Trek intended to harm LeMond Cycling.

> (2) *Arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity;*
>
> ...

The complaint alleges that Trek failed to intervene on behalf of LeMond Cycling to stop Lance Armstrong's publication of false information about LeMond, but it does not allege the opposite – i.e., that Trek published false information or directed Lance Armstrong to publish false information about LeMond.

> (5) *For which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement;*
>
> ...

There simply are no allegations in the complaint to support the application of this exclusion.

> (6) *Arising out of a breach of contract, except an implied contract to use another's advertising idea in your 'advertisement';*
>
> ...

"As used in a liability insurance policy, the words 'arising out of' . . . are commonly understood to mean originating from, growing out of, or flowing from . . ." *Lawver v. Boling*, 238 N.W. 2d 514, 518 (Wis. 1976). Here, the personal and advertising injuries did not arise out of Trek's breach of contract. Instead, the opposite is true: the breach of contract arose out of the personal and advertising injuries (e.g., disparagement of LeMond Cycling's goods and services) that were alleged in the complaint.

### III. Contribution/Subrogation

Tudor once again argues that Lexington cannot bring claims for contribution and/or subrogation. The Court already rejected this argument when it denied Tudor's motion to

-9-

dismiss. "By bringing an 'alternative claims' complaint, Lexington correctly recognizes that subrogation and contribution are 'different paths to the same destination.' *McGee v. Bates*, 691 N.W. 2d 920, 923 (Wis. Ct. App. 2004). Lexington is entitled to be made whole to the extent that Tudor shirked its obligations to the mutual insured." 2011 WL 6189501, at *2 (E.D. Wis. Dec. 13, 2011).

Tudor also argues that Trek released Lexington's claims when Trek settled its coverage dispute with Tudor in May 2011. In reaching this settlement, Tudor agreed to pay Trek $450,000 in indemnity with respect to its own coverage obligations. Lexington was not a party to this agreement; in fact, Tudor refused to negotiate with Lexington. Prior to the Trek-Tudor settlement agreement, Lexington had already paid Trek's defense costs and entered into its own settlement agreement with Trek. The Trek-Tudor settlement does nothing to change the fact that Lexington is entitled to equitable relief from Tudor for incurring costs in the defense and settlement of the LeMond Cycling Lawsuit beyond what Lexington was obligated to pay. Moreover, given that the duty to defend is broader than the duty to indemnify, Tudor's $450,000 indemnity payment illustrates the tenuousness of its argument that it did not have a duty to defend Trek.

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT**:

1. Tudor's motion for summary judgment [ECF No. 22] is **DENIED**;

2. Lexington's motion for partial summary judgment [ECF No. 26] is **GRANTED**; and

3. On **March 19, 2013** at **9:30 a.m. (CST)**, the Court will conduct a telephonic status conference to discuss how to proceed with phase two of this litigation. The Court will initiate the call. The parties should submit a joint report one week prior.

Dated at Milwaukee, Wisconsin, this 6th day of February, 2013.

                                                  **BY THE COURT**:

                                                  _____
                                                  **HON. RUDOLPH T. RANDA**
                                                  **U.S. District Judge**